### In re COLTON EXPORT & IMPORT CO.

#### (District Court, S. D. New York. April 10, 1902.)

BANKRUPTCY—PREFERENCES—SURRENDER—NECESSITY.

Bankruptcy Act, § 60a, provides that a preference exists where the effect of the transfer is to enable one of the bankrupt's creditors to obtain a greater percentage of his claim than other creditors of the same class. Section 57g declares that the claims of creditors who have received preferences shall not be allowed unless they are surrendered. A creditor of a corporation, after its insolvency and within four months of the adjudication, loaned it $40,000, and afterwards received payments of some $26,000. During the same period other creditors had put merchandise into the estate, and had received nothing on account. It further appeared that the payments to the creditor in question were made after he had obtained representation on the corporation's board of directors. *Held*, that the creditor had received a preference of $26,000, which would have to be surrendered before he could prove the balance of his claim.

In Bankruptcy.

Sproull, Harmer & Sproull, for creditor Leach.
Merrill & Rogers, for trustee.

ADAMS, District Judge. The question presented here arises on a review of the referee's allowance of a creditor's claim without the surrender of an alleged preference received by him. The trustee of the estate filed petitions with the referee during 1901, praying for the re-examination of certain claims filed by creditors, on the ground that they had received part payments on account of their claims from the bankrupt while insolvent, and within four months of the filing of the petition. Among other claims was one by Arthur B. Leach for $14,428.08. Upon the re-examination it was found that Leach had received a preference of $27,457.98, and his claim was disallowed unless he should surrender the preference. Thereafter Leach moved for a reconsideration on the ground that both the indebtedness of the bankrupt to him and the payments made to him and asserted in the order to be a preference, were made by the bankrupt within four months of the filing of the petition, and that the dealings between the parties resulted in an increase of the indebtedness of the bankrupt to Leach. Upon such reconsideration, the following facts were agreed upon, viz.:

"(1) The facts contained in the recitals of said decree." (These facts appear herein so far as necessary for the present discussion.)

"(2) The Colton Export & Import Company above named, was insolvent on and at all times after the 19th day of October, 1900."

"(3) The petition to adjudge the said company a bankrupt was filed with the clerk of this court on the 29th day of January, 1901."

"(4) Between the said 19th day of October, 1900, and the 29th day of January, 1901, the said company borrowed of and became indebted to said Leach in the sum of $42,027.03."

"(5) After the loans were made as aforesaid, and between the 15th day of November, 1900, and the 15th day of December, 1900, the said company made payments to the said Leach on account of its said indebtedness in the sum of $27,598.05. The following statement shows these transactions:

| | | |
|---|---:|---:|
| Loans to the Colton Company: | | |
| Oct. 20, 1900 | $10,000 00 | |
| Oct. 30, 1900 | 2,447 03 | |
| Nov. 9, 1900 | 1,978 00 | |
| Nov. 13, 1900 | 10,000 00 | |
| Nov. 13, 1900 | 7,602 00 | |
| Nov. 22, 1900 | 10,000 00 | |
| Total | | $42,027 03 |
| Payments by the Colton Company: | | |
| Nov. 27, 1900 | $14,185 58 | |
| Dec. 5, 1900 | 2,551 59 | |
| Dec. 10, 1900 | 10,000 00 | |
| Dec. 10, 1900 | 690 81 | |
| Dec. 12, 1900 | 170 07 | |
| | | 27,598 05 |
| Making a net balance due of | | $14,428 98 |

"(6) The circumstances under which the loans were made by Mr. Arthur B. Leach were as follows: The Colton Company was a corporation engaged in the exporting and importing of merchandise between its principal place of business in New York City and its branches in Japan and Manilla. The Company was also engaged in buying and selling goods itself and taking orders for goods here and sending orders to its representatives in Japan to be filled.

When the goods arrived here the Company had not the funds to take up the drafts and pay the duties. Prior to July 1900 the Bank of Montreal had purchased of the said Company these drafts with bills of lading attached as collateral representing the goods in process of shipment; on or about the 1st of July, 1900, the Bank of Montreal held over Seventy-five thousand ($75,000) dollars of these drafts and refused to purchase more. The United States Mortgage and Trust Company was then applied to by the Company, and at the request of Mr. Leach, who gave his guaranty to the Trust Company to the extent of Seven hundred ($700) dollars, the said Trust Company purchased drafts to the amount of about Six thousand ($6,000) dollars and thereupon refused to purchase more. Between the 1st of July, 1900, and the 19th of October, 1900, the said Arthur B. Leach on his own account purchased of the said Company these drafts with bills of lading attached as aforesaid in the sum of more than Forty thousand ($40,000) dollars. After October 19th, 1900, Mr. Leach purchased no more drafts of the Company but made the unsecured loans hereinbefore stated. The said Leach and Charles W. Colton, the president of the said Colton Company, have testified in this proceeding, which testimony is uncontradicted, that said loans were made upon the oral understanding that as the goods were delivered to and paid for by the party who had ordered them, or if bought for the Company for its own account to sell again, then, when the Company had sold the goods, the proceeds of the sale, less the Company's profit, were to be turned over to Mr. Leach. Mr. Leach and the president of the Company, Charles W. Colton, were personal friends, and the Company was in need of money; consequently no such understanding was adhered to; all or nearly all of the proceeds of the sale were left with the Company, and used by the Company to·pay for merchandise and other regular expenses, and in this way the indebtedness accumulated and increased from time to time."

"(7) On March 16, 1901, the creditor, Arthur B. Leach, filed proof of claim with the referee herein in the sum of the balance of his indebtedness, namely, $14,428.98."

"(8) On the 19th day of October, 1900, the said Leach was the owner and holder of One hundred shares of the stock of the Colton corporation and thereafter and on or before the 14th of November, 1900, he transferred said stock without consideration to one Frank C. Darling, a clerk in his employ."

"(9) On November 14th, 1900, two of the three directors constituting the Managing Board of the said corporation resigned, and were succeeded by the said Darling as the representative of said Leach, and one Charles C. Campbell, a brother-in-law of said Leach, who, with Charles W. Colton. the president of the Company, made up the Board of Directors of said Company at all times thereafter."

"(10) At all the times hereinbefore mentioned, i. e. between October 19th, 1900, and January 29th, 1901, there were other unsecured merchandise creditors of said company representing an indebtedness of more than $10,000, who received nothing from said Company on account thereof, but all the money loaned by said Leach, except such as was paid back to him, was used in the regular course of the business, and largely to pay off merchandise creditors of the Company."

"(11) Between the 19th day of October, 1900, and the 29th day of January, 1901, the Colton Export & Import Company purchased merchandise of different persons, who received nothing on account of such indebtedness, and their proofs of claim have been allowed herein."

The referee's opinion is as follows:

"This is a motion for a rehearing or review of an order heretofore made, so far as it affects the claim of A. B. Leach."

"Objections to various claims were heretofore made on the ground that those proving such claims had received preferences. An order, dated February 3rd, 1902, disallowed various claims unless preferences which had been paid should be returned to the trustee. Among other such claims was that of Arthur B. Leach. The claim as proved was for $14,428.98. The order

found that he had received a preference of $27,457.98, and directed that that be repaid before his claim should be allowed. No point was made on the first hearing that Mr. Leach had advanced more money than he had received after the bankrupt became insolvent. The facts stipulated show that within four months prior to the bankruptcy, and while the bankrupt was insolvent, Mr. Leach loaned to the bankrupt $42,027.03, without security, and that he received on account $27,598.05, leaving a net balance due of $14,428.98, which he proved. It appears from these facts that the estate, after its insolvency, gained more than it lost by the total transactions between the bankrupt and Mr. Leach; and I therefore think that there was no preference under the cases of In re Dickson, 7 Am. Bankr. R. 186, 111 Fed. 726; Peterson v. Nash, 7 Am. Bankr. R. 181, 112 Fed. 311; and McKey v. Lee, 5 Am. Bankr. R. 267, 45 C. C. A. 127, 105 Fed. 923."

"The trustee's counsel claims in his brief filed that there are various grounds upon which this case can be distinguished from those cited, but I am not able to see that there is any substantial difference in principle between them."

"I think that the motion should be granted, and an order entered amending the order of February 3rd, by striking out the provision requiring Mr. Leach to repay any amount, and providing that his claim, as filed, should be allowed."

The cases cited by the learned referee are not, I think, strictly in point. In McKey v. Lee certain sales were made subsequent to the receipt of innocent preferences, and set-offs were allowed under paragraph "c," § 60, of the act. In Peterson v. Nash that paragraph was also applied to enable a creditor to offset new credits against preferential payments so as to nullify the latter. The language of those cases, while incidentally touching the controversy here, should be confined in its application to the state of facts then under consideration. In this case, all the payments which are said to constitute the preference were made after the last loan, so that no question of set-off can affect it. In re Dickson was a case where payments for previous purchases were usually made at the end of the month for goods purchased within the month, each of the purchases being paid for by itself. The petition in bankruptcy was filed on December 13, 1899. Going back four months, the last transaction prior thereto was on August 10th, which was a sale of merchandise amounting to $128.20. There had been a sale on August 7, 1899, amounting to $676.01, the total of these sales being $804.21. On the 13th of August, just four months before the petition was filed, the bankrupt owed the creditors only this amount of $804.21. All merchandise sold prior to the 13th of August had been paid for, the last payment having been made on August 8th. There were subsequent transactions, within the four months preceding the filing of the petition, by which notwithstanding the payments during the time increased the indebtedness $1,369.99. Upon these facts it was held that as there was no intention to acquire any unjust preference and the creditors had by the transactions increased the bankrupt estate, they were entitled to prove their claim. The court there says that the Supreme Court in Pirie v. Trust Co., 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171, had not in terms passed upon the proposition arising from the fact that no payments had been made during the four months on account of any merchandise the price of which constituted any particular item offered to be proved, and it was not bound to follow a literal interpretation of the act when it would result so unjustly in the case under consideration. It did not appear there,

however, that there were any other creditors of the same class with the one whose claim was allowed.

In this case, it appears that there were other creditors of the same class with Leach. He had after insolvency and during the four months preceding the filing of the petition put more money into the estate than he had received from it but he had received payments on account. Other creditors had put merchandise into the estate during the same period and had received nothing whatever on account. Money and merchandise cannot be legally distinguished in these matters (Pirie v. Trust Co., 182 U. S. 443, 21 Sup. Ct. 906, 45 L. Ed. 1171; McKey v. Lee, 5 Am. Bankr. R. 271, 45 C. C. A. 127, 105 Fed. 923), and I do not 'see how it is possible here to avoid the unmistakable meaning of section 60a, providing that a preference exists where the effect of the transfer will be to enable any one of a bankrupt's creditors to obtain a greater percentage of his debt than any other of such creditors of the same class, and of the provision of section 57g, that the claims of creditors who have received preferences shall not be allowed unless there is a surrender of the preferences. In this case, Leach loaned the bankrupt, say, $40,000, and received payments of, say, $26,000. If his present claim is allowed, and there should be a dividend of 50 per cent., he would receive $7,000 on the balance, and altogether $33/40$, or about 82 per cent., of his whole claim. The other creditors, participating in the dividend only, would receive 50 per cent. of their whole claim. It is true that certain equitable considerations appear in Leach's claim, from the fact that he paid more into the estate than he received from it, which would seemingly bring it within the general language employed in the cases cited in support of the referee's decision, and which might tend to establish the claim if it should be made manifest that the other creditors had received a benefit from an enlargement of the estate through the loans made by Leach, of which their own contributions to the estate did not form a part, but the other creditors here seem to be in substantially the same position as Leach. Moreover, I think that an intent to prefer Leach can properly be inferred from the circumstances. He appears to have been on the same footing as other creditors until he obtained representation upon the board of directors, and it was after securing control, to some extent at least of the insolvent corporation, that he obtained his payments on account, while the other creditors were getting nothing. I see no reason for attempting to avoid the letter of the act in this case. Equality, within its meaning, will be secured by adhering to it.

The order of the referee allowing the claim is reversed.